IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JONATHAN DEWA, REBECCA LAATE,
and JONATHAN DEWA and REBECCA
LAATE on behalf of their minor children
DILLION DEWA AND NATHAN DEWA,

           Plaintiffs,

vs.                                                    Civ. No.  10-766 JH/GBW

SALVADOR ASEBEDO, individually and
in his official capacity, and DEPARTMENT
OF PUBLIC SAFETY (NEW MEXICO
STATE POLICE), STATE OF NEW MEXICO,

           Defendants.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment [Doc. No. 19], filed February 7, 2011.  After reviewing the motion, the briefs and evidence filed by the parties, as well as the applicable legal authorities, the Court concludes that the motion should be granted and summary judgment should be entered in favor of the Defendants.

## LEGAL STANDARD

Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815 (2009) (quotation omitted).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*.

"Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When the defendant asserts "the qualified immunity defense, the burden shifts to the plaintiff, who must meet a strict two-part test by showing (1) that the defendant violated a constitutional or statutory right, and (2) that this right was clearly established at the time of the defendant's conduct." *Cassady v. Goering*, 567 F.3d 628, 634 (10th Cir. 2009) (quotations omitted). A plaintiff's failure to meet either requirement requires the court to grant summary judgment in favor of the defendant. *See Swanson v. Town of Mountain View*, 577 F.3d 1196, 1199 (10th Cir. 2009). The court must construe the facts in the light most favorable to the plaintiff as the nonmoving party to determine whether he has met his burden of establishing a clearly established constitutional violation. *Scott v. Harris*, 550 U.S. 372, 378, 380, 127 S. Ct. 1769 (2007). Even so, "because at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record. . . ." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).

## FACTS

Except as otherwise noted, the following facts are undisputed. Where there is a dispute, the Court views the facts in the light most favorable to the Plaintiffs.

Defendant Salvador Asebedo ("Asebedo") is a patrolman with the New Mexico State Police who is assigned to the Gallup office of the New Mexico Department of Public Safety. On Friday, June 13, 2008, Asebedo was on patrol from 6:00 p.m. until 4:00 a.m. as part of the State-Tribal DWI Task Force, which included officers from the State Police, the City of Gallup Police Department, the McKinley County Sheriff's Department, and various tribal police departments. At approximately 8:20 p.m. that evening, Asebedo was performing a traffic stop on State Road 53 when he received a radio call from Sargent Edwin Yazzie of the Gallup Police Department. Sargent

Yazzie asked Asebedo to run a driver's license check on Plaintiff Jonathan Dewa ("Dewa"). Asebedo did so, and as a result obtained information that there was a possible warrant for Dewa's arrest in the State of Washington. Asebedo conveyed the information to Yazzie, completed his traffic stop, and then drove to Yazzie's location on Zuni Route 4 near the intersection with State Road 53 in order to provide him with backup assistance. This particular location was on the Pueblo of Zuni reservation.

When he arrived, Asebedo saw a 2004 Chevrolet pickup truck that had been driven by Dewa. With Dewa in the truck were his wife, Plaintiffs Rebecca Laate ("Laate"), and their two young sons Dillion (age 5) and Nathan (age 3). All four Plaintiffs are enrolled members of the Zuni Tribe. Yazzie told Asebedo that he had pulled over Dewa because he had swerved and almost collided with Yazzie's vehicle while turning onto Zuni Route 4. Yazzie also told Asebedo that he had smelled alcohol on Dewa's breath, that he had red, bloodshot, and watery eyes, and that after conducting the Horizontal Gage Nystagmus Test, he suspected that Dewa might be impaired.[1] Because they were located within the boundaries of the Zuni Indian Reservation and Dewa was a member of the Zuni tribe, Yazzie used his radio to call for a Zuni Pueblo police officer to come to the scene. However, before the Zuni Pueblo officer arrived, two other members of the State-Tribal DWI Task Force arrived: Detective Anthony Seciwa and Detective Harold Littlefield, both of the City of Gallup police department.

At this point, Zuni Pueblo police officer Derrick Quetawki arrived. In Asebedo's presence,

---

[1] In their briefs, Plaintiffs dispute that Dewa had been drinking or that he almost collided with Yazzie's vehicle. However, beyond the arguments of counsel the Plaintiffs present no evidence to support this assertion. In their affidavits they do not directly state that Dewa had not been drinking; they merely state that when asked by law enforcement officers, he denied drinking. More importantly, they do not dispute that Yazzie made the foregoing statements to Asebedo.

Yazzie informed Quetawki that Dewa had almost sideswiped him, and that Yazzie had observed that Dewa had red, watery eyes and slightly slurred speech. Yazzie also told Quetawki that he had administered a field sobriety test to Dewa and had seen an indicator that Dewa might be impaired. Quetaki spoke briefly to Dewa alone, and following that conversation he told Yazzie that he did not believe Dewa was impaired. Quetaki gave the order to release Dewa, who drove away from the scene. Quetawki did not perform any field sobriety tests on Dewa before releasing him. As Dewa drove away, Asebedo noticed that the vehicle registration sticker on the license plate appeared to have expired. Asebedo asked the other officers if they had noticed the sticker, but they said that they had not.

    Asebedo resumed his patrol duties by driving north on State Road 602, which runs between the City of Gallup and Zuni. At approximately 9:00 p.m., Asebedo saw Dewa's pickup truck also heading north, though at a slow rate of speed. As he pulled up behind Dewa, Asebedo could see that the registration sticker on Dewa's license plate had expired fifteen months earlier, in February of 2007. Using the mobile data center in his patrol car, Asebedo confirmed that the registration had expired and discovered that the vehicle lacked insurance coverage. Accordingly, Asebedo pulled over Dewa near mile marker 11 on State Road 602. It is undisputed that the stop occurred approximately 3.75 miles north of the northern boundary line of the Zuni Indian reservation, and some distance east of the eastern boundary of the Navajo Indian reservation.

    Asebedo informed Dewa, who was driving the pickup truck, that the registration on his vehicle had expired and that it was not insured. Driving an unregistered vehicle and driving an uninsured vehicle are violations of New Mexico law. *See* NMSA 1978, §§ 66-3-1(A), 66-3-13, 66-3-19(E), and 66-5-205(B). Accordingly, Asebedo returned to his patrol car, where he wrote up two citations against Dewa, one for each offense. Then Asebedo returned to Dewa and his pickup truck.

4

Asebedo asked Dewa to get out of the truck so that he could explain the citations. Then Dewa signed both traffic tickets. At that point, Asebedo told Dewa that Yazzie had concerns that Dewa had been drinking. Asebedo asked Dewa if he had been drinking, which Dewa denied. Asebedo conducted some field sobriety tests on Dewa. These included having him stand on one leg and count to thirty, as well as an eye test. Next, Asebedo asked Dewa if he would be willing blow into a remote breath testing device ("RBT"). Dewa agreed, and attempted to do so. However, the RBT malfunctioned and air leaked out, preventing the device from taking a correct reading of Dewa's blood alcohol level. Then Asebedo told Dewa that he believed Dewa was intoxicated, and therefore he was going to impound Dewa's truck. Laate asked Asebedo to call their family members because neither her cell phone nor Dewa's cell phone had service in that location. Asebedo refused, and said that Plaintiffs could call their families themselves, or they could start walking. He did not offer them a ride or inform them that they could get a ride from the tow truck. By the time Asebedo released the Plaintiffs to go home, it was getting dark, and Plaintiffs' sons were scared and crying. They all started walking along the highway toward a nearby gas station/liquor store called Sabino's, but after nearly getting hit by an 18-wheeler, they got off the roadside and walked through the weeds and brush instead. Once they arrived at Sabino's, the family was able to obtain a ride home.[2]

---

[2] In his affidavit, Asebedo sets forth a different version of events. He claims that after Dewa signed the two tickets, he explained to Dewa that Yazzie had concerns about his sobriety and asked Dewa if he would mind blowing into the RBT. He asserts that Dewa agreed but then intentionally obstructed the airway of the machine so that it would not function properly. As a result of Dewa's noncompliance, Asebedo then decided to administer two field sobriety tests to Dewa, but the results did not establish probable cause to believe that he was intoxicated. He then contacted the dispatcher, who in turn called a tow truck to take away Dewa's truck. Asebedo claims that he told Plaintiffs that they could obtain a ride to Gallup with the tow truck driver, or they could call someone to pick them up. Asebedo asserts that Dewa said that his wife and kids needed to use the restroom and that Dewa asked if they could walk to Sabino's. Asebedo said that was fine. As previously stated, for the purposes of this summary judgment motion, the Court accepts Dewa's version of events to the extent it conflicts with Asebedo's

On June 14, 2010, Plaintiffs filed their Complaint in the Eleventh Judicial District Court, McKinley County, New Mexico, asserting one claim pursuant to 42 U.S.C. § 1983 for violation of their Fourth Amendment right to be free of unreasonable seizures, and a second claim under the New Mexico Tort Claims Act for violation of their state constitutional right to be free of unreasonable seizures.[3]  The Defendants then removed the case to this United States District Court.

## DISCUSSION

### I.   JURISDICTION TO CONDUCT THE TRAFFIC STOP

The first issue before the Court is whether the stop occurred in Indian country, defined as (1) lands within the limits of an Indian reservation; (2) "dependent Indian communities"; and (3) "Indian allotments."  18 U.S.C. § 1151.  Indian country is subject to exclusive federal or tribal criminal jurisdiction "[e]xcept as otherwise expressly provided by law."  18 U.S.C. § 1152. Plaintiffs contend that the traffic stop conducted by Asebedo near mile marker 11 on State Road 602 occurred on "Indian trust land," such that Asebedo lacked jurisdiction to conduct the stop.[4]  Land

---

affidavit.

[3] The New Mexico State constitution provides no greater protections against unreasonable search and seizure than does the Fourth Amendment to the United States constitution.  *See State v. Romero*, 132 N.M. 364, 369-70 (Ct. App. 2002).

[4] While the parties argue about whether the stop occurred in Indian country or Indian trust land, neither party has addressed the issue of precisely how the question of Asebedo's jurisdiction to conduct a traffic stop affects Plaintiffs' claim that he violated their constitutional right to be free from unreasonable seizures.  In both their Complaint and their response to the motion for summary judgment, Plaintiffs obliquely suggest that if the stop occurred on Indian trust land, and Asebedo was outside of his jurisdiction, then the stop was unconstitutional. However, the Supreme Court has noted that if officers have probable cause to believe that a crime has been committed in their presence, they may arrest and search incident to that arrest without violating the Fourth Amendment, even if such police action is not authorized by state law.  *Virginia v. Moore*, 553 U.S. 164, 128 S.Ct. 1598, 1608 (2008).  In other words, state law governing the jurisdiction of law enforcement officers does not determine the reasonableness of a seizure under the Fourth Amendment. The Tenth Circuit applied *Moore* in *United States v.*

6

held in trust for Indian use is "Indian country" as that term is defined in 18 U.S.C. § 1151. *United States v. John*, 437 U.S. 634, 648-49, 98 S.Ct. 2541, 2548-49 (1978); *Cheyenne-Arapaho Tribes v. Oklahoma*, 618 F.2d 665, 668 (10th Cir. 1980).

Although the relevance of the jurisdictional question to the constitutional claims is not clear, the Court concludes that it need not ask the parties for additional briefing on the issue because on the record currently before the Court, there is no genuine issue of material fact as to Asebedo's jurisdiction to conduct the stop. The Court concludes that Asebedo did have jurisdiction.

### A.    Lands Within the Limits of an Indian Reservation

It is undisputed that the traffic stop at issue here did not occur within the boundaries of any Indian reservation. Defendants have come forward with evidence, in the form of the affidavits from Asebedo and investigator William Johnson, along with supporting photographs, demonstrating that fact. Plaintiffs make no attempt to controvert that evidence. Accordingly, this aspect of 18 U.S.C. 1151 is not satisfied.

However, Plaintiffs do argue that the traffic stop occurred on Indian trust land. The Tenth Circuit has observed that "lands owned by the federal government in trust for Indian tribes are Indian Country pursuant to 18 U.S.C. § 1151." *United States v. Roberts*, 185 F.3d 1125, 1131 (10th Cir. 1999). In *Buzzard v. Oklahoma Tax Comm'n*, 992 F.2d 1073, 1076-77 (10th Cir. 1993) the Tenth Circuit explained:

> [T]rust land is set apart for the use of Indians by the federal

---

*Gonzales*, 535 F.3d 1174, 1183 (10th Cir. 2008), and held that police officers' traffic stop of the defendant, outside of their jurisdiction and in violation of Colorado law, did not violate the Fourth Amendment. *See id.* at 1182-83. *But see Ross v. Neff*, 905 F.2d 1349, 1353-54 (10th Cir. 1990) (holding that a warrantless arrest of an Indian on Indian trust land by a state police officer acting outside his jurisdiction is analogous to a warrantless arrest without probable cause, and therefore violates the Fourth Amendment).

>government because it can be obtained only by filing a request with the Secretary of the Interior, who must consider, among other things, the Indians' need for the land and the purposes for which the land will be used. If the request is approved, the United States holds the land as trustee. Thus, land is "validly set apart for the use of Indians as such" only if the federal government takes some action indicating that the land is designated for use by Indians.

*Buzzard*, 992 F.2d at 1076 (internal citations omitted).  The Supreme Court has held that there is no relevant distinction between tribal trust land and reservations for the purpose of tribal sovereign immunity.  *See Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 511, 111 S.Ct. 905 (1991).  This view is consonant with other federal court holdings that an Indian reservation includes trust lands.  *See United States v. John*, 437 U.S. 634, 649, 98 S.Ct. 2541 (1978) (finding "no apparent reason" why lands held in trust should not be considered a "reservation" under § 1151(a)); *HRI, Inc. v. EPA*, 198 F.3d 1224, 1249-54 (10th Cir. 2000) (same); *United States v. Azure*, 801 F.2d 336, 339 (8th Cir. 1986) (considering tribal trust land to be Indian country under either § 1151(a) as a " de facto" reservation or § 1151(b) as a dependent Indian community); *United States v. Sohappy*, 770 F.2d 816, 822-23 (9th Cir. 1985) (holding that trust land is a "reservation" under § 1151(a)).

However, Plaintiffs must come forward with more than a mere allegation that the stop occurred on trust lands; under Rule 56, they must come forward with admissible evidence.  The rule provides that an affidavit submitted in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1).  This the Plaintiffs have failed to do.  They have not come forward with any testimony, whether through affidavits or depositions, that supports their contention that the traffic stop occurred on trust land.

Plaintiffs have attached a map to the Affidavit of Jonathan Dewa (Exhibit 4 to Doc. No. 22) that purports to demonstrate that mile marker 11 is on Indian trust land. However, Dewa's affidavit does not refer to the map, much less explain what the map shows or provide the authentication required to support its admissibility. Plaintiffs also filed a second map as a supplemental exhibit (Doc. No. 27). Again, the map is unsupported by affidavit or deposition testimony. Plaintiffs' counsel states that the map comes from the McKinley County Assessor's Office and that it demonstrates that mile marker 11 is on "Indian Land." However, argument of counsel is not evidence, and therefore the map is not admissible under Rule 56 as it lacks proper authentication and explanation. Thus, the Court concludes that, on the record presently before it, the traffic stop at mile marker 11 on State Road 602 did not occur within the limits of an Indian reservation or on Indian trust lands.

### B.     Dependent Indian Communities

Despite the fact that Plaintiffs do not contend that the traffic stop occurred in a dependent Indian community, Defendants spend much of their brief arguing this point. However, because the Plaintiffs do not dispute the issue of whether mile marker 11 on State Road 602 is located on a dependent Indian community, the Court need not analyze the issue here.[5]

### C.     Indian Allotments

Neither Plaintiffs nor Defendants contend that the traffic stop took place on an Indian allotment, and therefore this portion of § 1151 does not apply.

---

[5] Although ultimately the question is not relevant, it is worth noting that the Defendants analyzed the question of whether the stop occurred within a dependent Indian community under the wrong standard. The Defendants applied the legal framework set forth in *Pittsburg & Midway Coal Mining Co. v. Watchman*, 52 F.3d 1531 (10th Cir. 1995) and *United States v. Adair*, 111 F.3d 770 (10th Cir. 1997). However, in *Hydro Resources, Inc., v. U.S. Environmental Protection Agency*, 608 F.3d 1131, 1148-49 (10th Cir. 2010), the Tenth Circuit overruled *Watchman* and outlined a new approach in light of the Supreme Court's opinion in *Alaska v. Native Village of Venetie*, 522 U.S. 520, 118 S. Ct. 948 (1998).

In light of the foregoing, the Court concludes that there is no genuine issue of material fact as to Asebedo's jurisdiction to conduct the traffic stop.

## II.     VIOLATION OF CLEARLY ESTABLISHED FOURTH AMENDMENT RIGHTS

Plaintiffs argue that Asebedo violated their constitutional right to be free from unreasonable seizures when he conducted the traffic stop. Although Plaintiffs' complaint is not entirely clear, it appears that their claim has two components. First, they contend that the traffic stop itself was unconstitutional. Second, they contend that Asebedo's actions after the stop—e.g., refusing to give them a ride or to call someone to come get them, thereby forcing them to walk along a dark, busy highway—violated their constitutional rights. The Court addresses each in turn and concludes that Defendants are entitled to qualified immunity on Plaintiffs' claims.

### A.     The Traffic Stop and Seizure of Dewa's Truck

A routine traffic stop is indisputably a seizure within the meaning of the Fourth Amendment. *United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1226 (10th Cir. 2008). However, because a traffic stop is "necessarily [a] swift action predicated upon the on-the-spot observations of the officer on the beat," an officer need only reasonably suspect that a crime is in the offing to justify such a detention. *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968). Reasonable suspicion arises when "an officer of reasonable caution" has a "particularized and objective basis for suspecting the person stopped of criminal activity" judged against the totality of the circumstances. *Id*. at 1133-34 (quotations omitted). A mere hunch or conjecture will not suffice. *United States v. Karam*, 496 F.3d 1157, 1162 (10th Cir. 2007); *see also United States v. Caro*, 248 F.3d 1240, 1246 (10th Cir. 2001). A traffic stop does not offend the Constitution if it is based upon "an observed traffic violation or . . . reasonable articulable suspicion that [an actual] traffic or equipment violation has

occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc).

*Terry* set forth a two-step framework for determining the constitutional scope of a traffic stop: (1) the stop must be "justified at its inception," and (2) the resulting detention must be "reasonably related in scope to the circumstances that justified the stop in the first place." *United States v. Winder*, 557 F.3d 1129, 1133-34 (10th Cir. 2009) (quotations omitted). "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop." *Id*. at 1134 (quotation omitted). Although the detaining officer's subjective motivations are irrelevant to the inquiry, the court may weigh objectively reasonable mistakes of fact made by the officer in favor of reasonable suspicion. *Winder*, 557 F.3d at 1134.

Here, it is undisputed that before Asebedo pulled over Dewa's truck, Asebedo ascertained that the truck lacked both current registration and required insurance coverage. It is also undisputed that driving without registration and insurance violates New Mexico law. Thus, there can be no doubt but that Asebedo had reasonable suspicion to pull over Dewa's truck. Plaintiffs' contention that Asebedo was motivated by his inaccurate belief that Dewa had been drinking is irrelevant to the constitutional analysis. As the Court has already noted, as long as Asebedo had reasonable suspicion that a traffic violation was occurring, he was entitled to pull over the truck and conduct a traffic stop. His subjective motivations have no bearing on the matter. *United States v. Winder*, 557 F.3d 1129, 1133–34 (10th Cir. 2009). Thus, the traffic stop was justified at its inception and did not violate Plaintiffs' constitutional rights. Furthermore, it is undisputed that New Mexico law authorizes an officer to impound a vehicle when it is being driven without registration or insurance. *See* NMSA 1978, §§ 66-3-19(E) and 29-2-18(B). *Accord New Mexico Dept. of Pub. Safety Policy No. OPR:36*, § 6.0(G), attached as Ex. A-2 to Asebedo's affidavit. Again, the officer's subjective

motivations for impounding the truck have no bearing on the constitutional analysis.

Next, Plaintiffs suggest that Asebedo unconstitutionally expanded the scope of the stop when he conducted field sobriety tests on Dewa after issuing the citations. "As a general rule, once an officer's purpose in a traffic stop based on probable cause or reasonable suspicion is complete, the officer must let the person go." *United States v. Ozbirn*, 189 F.3d 1194, 1199 (10th Cir. 1999). *See also United States v. Villegas*, 554 F.3d 894, 898 (10th Cir. 2009) ("A driver must be permitted to proceed after a routine traffic stop if a license and registration check reveal no reason to detain the driver unless the officer has reasonable articulable suspicion of other crimes . . . ."). Again, the Court disagrees with the Plaintiffs and concludes that Dewa did not unconstitutionally expand the scope of the Terry stop. Even before he initiated the stop, Asebedo possessed reasonable suspicion to believe that Dewa may have been driving while intoxicated. This reasonable suspicion was based upon statements that Yazzie had made to Asebedo, including that he had pulled over Dewa because he had swerved and almost collided with Yazzie's vehicle while turning onto Zuni Route 4; that Yazzie had smelled alcohol on Dewa's breath; that Dewa had red, bloodshot, and watery eyes; and that after conducting the Horizontal Gage Nystagmus Test, Yazzie suspected that Dewa might be impaired. Furthermore, Asebedo watched as Quetaki released Dewa without investigating whether Dewa was impaired. Thus, based upon this information that he possessed before the stop, Asebedo had reasonable suspicion to conduct field sobriety tests on Dewa and to employ the RBT. Plaintiffs suggest that Yazzie's observations were faulty, and therefore Asebedo had no right to rely upon them in order to question Dewa's sobriety. However, as the Defendants correctly point out, "[p]olice officers are entitled to rely upon information relayed to them by other officers in determining whether there is reasonable suspicion to justify an investigative detention . . ." *Oliver v. Woods*, 209 F.3d 1179, 1190 (10th Cir. 2000). Based on all of the foregoing, the Court concludes

that Asebedo had reasonable suspicion to conduct field sobriety testing on Dewa, and that he did not impermissibly expand the scope of the traffic stop.

Finally, in addition to concluding that the stop did not violate Plaintiffs' Fourth Amendment rights, the Court notes that Plaintiffs have failed to meet their burden to cite clearly established law demonstrating that their rights were violated.

### B. Asebedo's Conduct After the Stop

Plaintiffs suggest that Asebedo violated their constitutional rights by refusing to call a family member to come pick them up, by failing to inform them that they could get a ride with the tow truck driver, and by forcing them to walk along a dangerous highway in the dark. Assuming merely for the sake of argument that these actions did violate Plaintiffs' constitutional rights, Defendant Asebedo is still entitled to qualified immunity because Plaintiffs have failed to meet their burden to show that his actions violated clearly established law. Thus, Asebedo's motion for summary judgment will be granted.

### C. Claims Against the Department of Public Safety

Having concluded that Asebedo is entitled to summary judgment on both claims on qualified immunity grounds, the Court further concludes that Defendant Department of Public Safety is also entitled to summary judgment on Plaintiffs' remaining claim against it.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment [Doc. No. 19] is **GRANTED**.

_____
UNITED STATES DISTRICT JUDGE